IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


PAMELA MILLER,

        Plaintiff,

        v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

        Defendant.

Case No. 1:16-cv-00876-SB

**OPINION AND ORDER**

**BECKERMAN, Magistrate Judge.**

        Pamela Miller ("Miller") brings this appeal challenging the Commissioner of Social

Security's ("Commissioner") denial of her application for Social Security disability insurance

benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34. The Court has

jurisdiction to hear this appeal pursuant to 42 U.S.C. § 405(g). For the reasons explained below,

the Court affirms the Commissioner's decision because it is free of legal error and supported by

substantial evidence.

# BACKGROUND

Miller stands five-feet, four-inches tall and her weight fluctuated between 215 and 235 pounds during the relevant time period. She was born in August 1950, making her fifty-nine years old on May 1, 2010, the amended alleged disability onset date. Miller completed two years of college, and her past relevant work includes time as an office manager. She alleges disability due primarily to chronic fatigue syndrome, back pain, and arthritis.

On May 7, 2012, Miller presented for a follow-up visit with her primary care physician, Dr. James Calvert ("Dr. Calvert"). Dr. Calvert noted that Miller suffers from, among other things, hypertension that is "fairly well controlled" by medication, back pain, and chronic fatigue syndrome. (Tr. 344.) Dr. Calvert added that Miller "has been compliant with taking medications as directed but has been having difficulty complying with the recommended levels of diet and exercise." (Tr. 344.) Dr. Calvert instructed Miller to exercise regularly and reduce her caloric intake.

On July 4, 2012, Miller experienced chest pain while "doing some mild to moderate . . . cleaning around the house." (Tr. 250.) Miller was admitted to the hospital where she experienced a syncopal episode and was diagnosed with "hypertension following a mild tachyarrhythmia, with a few premature ventricular contractions, which were symptomatic to the patient." (Tr. 253.) An echocardiogram "was unremarkable except for a mild cardiomegaly."[1] (Tr. 314.)

On July 18, 2012, Miller visited Dr. Calvert and complained of "moderate to severe fatigue" that had been present for months and had been "waxing and waning over time but is overall nonprogressive." (Tr. 354.) Miller reported that she had been eating, exercising, and

---

[1] "Cardiomegaly is the enlargement of the heart." *Scott v. Astrue*, No. 09-3999, 2010 WL 2736879, at *3 n.32 (E.D.N.Y. July 9, 2010).

taking her medications as directed. Dr. Calvert noted that Miller was "improving" following her recent hospitalization. (Tr. 354.)

On July 28, 2012, Ronald Miller ("Mr. Miller") completed a third-party adult function report in support of his wife's application for Social Security benefits. Mr. Miller testified that his wife suffers from arthritis in her hands and back, which negatively impacts her ability to lift more than ten pounds, sit, stand, walk, reach, kneel, squat, bend, use her hands or put strain on her back for more than an hour, and complete household chores, such as cooking and cleaning. Mr. Miller added that his wife's daily routine consists of watching television, watering plants, eating, paying bills, caring for her husband (who is disabled) and a small dog, reading, and using the computer. Mr. Miller also stated that family members assist on occasion with his care and work around the house, and his wife dusts, shops, assists with laundry, and does light gardening on a weekly basis. (Tr. 208-15.)

Miller presented for a follow-up visit with Dr. Calvert on August 22, 2012. Miller reported that her fatigue was "gradually worsening" and she had been "compliant with [the] recommended diet, level of exercise, and medications." (Tr. 411.) Dr. Calvert advised Miller to continue reducing her caloric intake, exercising regularly, and eating a "low fat, low cholesterol diet." (Tr. 414.)

On October 8, 2012, Miller was referred to Dr. Thomas Shields ("Dr. Shields") for a psychological evaluation. As part of his evaluation, Dr. Shields reviewed Miller's medical records, conducted a clinical interview and mental status examination, and assessed Miller's independence in activities of daily living based on her own self-reports. Dr. Shields' diagnoses were major depressive disorder "in sustained full remission since the late 1990s" and adjustment disorder. (Tr. 425.) Dr. Shields concluded that Miller is "cognitively capable of understanding,

remembering, and carrying out both simple and complex instructions," and that Miller's "ability to sustain concentration over extended periods of time is expected to be mild-to-moderately impaired secondary to pain- and fatigue-driven distractibility." (Tr. 425.) Dr. Shields also noted that Miller's ability to "physically persist . . . should be evaluated medically" since he is a psychologist and is therefore "not qualified" to comment on Miller's "physical health." (Tr. 424-25.)

On October 23, 2012, Dr. Lloyd Wiggins ("Dr. Wiggins"), a non-examining state agency physician, completed a physical residual functional capacity assessment. Based on his review of the medical record, Dr. Wiggins determined that Miller could lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand, or walk up to six hours in an eight-hour workday; push or pull in accordance with her lift and carry restrictions; frequently stoop, kneel, crouch, crawl, and climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; and balance without limitation. Dr. Wiggins added that Miller needs to avoid concentrated exposure to hazards (heights and machinery, etc.), extreme cold and heat, and fumes, odors, dusts, gases, and poor ventilation. He also found no evidence of manipulative, visual, or communicative limitations. (Tr. 60-61.)

On October 26, 2012, Dr. Michael Brown ("Dr. Brown"), a non-examining state agency psychologist, completed a psychiatric review technique assessment. Dr. Brown found that the limitations imposed by Miller's mental impairments failed to satisfy listing 12.04 (affective disorders). (Tr. 58.)

On July 3, 2013, x-rays revealed that Miller suffers from "[m]ild osteoarthritis of the medial compartment of the right knee." (Tr. 341.) X-rays of Miller's right hip were normal. (Tr. 340.)

On July 29, 2013, Dr. Kordell Kennemer ("Dr. Kennemer"), a non-examining state agency psychologist, completed a psychiatric review technique assessment. Dr. Kennemer agreed with Dr. Brown's initial assessment that Miller's mental impairments failed to satisfy listing 12.04. (Tr. 74-75.)

On July 30, 2013, Dr. Richard Alley ("Dr. Alley"), a non-examining state agency physician, completed a physical residual functional capacity assessment, agreeing with Dr. Wiggins' findings. (Tr. 76-77.)

On December 11, 2013, Miller presented for a follow-up visit with Dr. Calvert, complaining of an irregular pulse, chest pressure, fatigue, and right hip pain that radiated down her leg and interfered with her ability to sleep. Dr. Calvert noted that a recent x-ray of Miller's hip was normal, that Miller had "been having difficulty complying with the recommended levels of diet and exercise," that Miller has been "[u]nable to work for gainful employment . . . for over a year now," and that it is "unlikely or impossible" that Miller will ever be able to return to work. (Tr. 437-38.)

That same day, December 11, 2013, Dr. Calvert completed a medical source statement in support of Miller's application for Social Security benefits. In his medical source statement, Dr. Calvert (1) stated that Miller is unable to perform light or sedentary work, even if she was allowed to rotate between a seated and standing position, (2) estimated that Miller could no longer work as of May to June 2011, (3) opined that Miller suffers moderately severe impairment in her ability to maintain attention and concentration for extended periods of time, and she suffers from severe impairment in her ability to "perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances" and to "complete a normal workday and workweek without interruptions from medically based symptoms and to perform at

a consistent pace without an unreasonable number and length of rest periods," and (4) noted that Miller suffers from significant right hip arthritis and back pain that is not responding to treatment. (Tr. 444.)

On July 15, 2014, Miller established care with Dr. Katherine Mechling ("Dr. Mechling"). Dr. Mechling's assessment included degeneration of a lumbar disc, hypertension, depression, and Hashimoto's thyroiditis.[2] Dr. Mechling advised Miller to continue on her current medications and to consider seeking counseling. The next month, Dr. Mechling recommended a gradual exercise program and referred Miller to the "YMCA for exercise, dietary counseling, possible personal trainer, [and counseling on] living with [a] chronic condition." (Tr. 453.) Dr. Mechling added that she did not "foresee another appointment for another [three] months." (Tr. 453.)

An administrative law judge ("ALJ") convened a hearing on August 28, 2014, at which Miller testified about the limitations resulting from her impairments. Miller testified that she stopped working as an office manager on May 1, 2010, when it was determined that she was "incompatible for that office." (Tr. 33.) At that time, Miller was having difficulty completing a forty-hour workweek and producing spreadsheets in a timely manner, due largely to her chronic fatigue immune dysfunction syndrome. (Tr. 34-35.) Miller explained that her chronic fatigue negatively impacts her ability to feel alert, lift her arms, complete work-related tasks, maintain focus, and perform certain activities of daily living (e.g., paying bills, vacuuming, yard work, attending her grandson's graduation, driving, and showering on a consistent basis). Miller added

___

[2] Hashimoto's thyroiditis is "synonymous with autoimmune thyroiditis," *Alford v. Hartford Life Ins. Co.*, No. 07-4527, 2008 WL 2329101, at *1 n.2 (E.D. Pa. June 3, 2008), and "characterized by chronic autoimmune inflammation of the thyroid with lymphocytic infiltration." *Hatfield v. Astrue*, No. 10-2055, 2011 WL 2110826, at *1 n.1 (W.D. Ark. May 26, 2011) (citation omitted). "Findings include painless thyroid enlargement and symptoms of hypothyroidism." *Id.*

that she suffers from chronic back pain and arthritis in her hands (in particular, her right hand), which impacts her grip and ability to lift more than one to two pounds, sit or stand for prolonged periods, paint, and crochet. However, Miller acknowledged that she is able to wash dishes by hand for five to ten minutes each day, lightly dust, prepare meals, get dressed, brush her teeth, and comb her hair.

The ALJ posed three hypothetical questions to a vocational expert ("VE") who testified at Miller's hearing. First, the ALJ asked the VE to assume that a hypothetical worker of Miller's age, education, and work experience could perform light work that involved: (1) frequent stooping, kneeling, crawling, and climbing of ramps and stairs; (2) occasional crouching and climbing of ladders, ropes, and scaffolds; and (3) avoiding concentrated exposure to non-weather related extreme heat and cold, airborne irritants (fumes, odors, dusts, and gases), and unprotected heights. The VE testified that the hypothetical worker could perform Miller's past relevant work as an office manager.

Second, the ALJ asked the VE to assume that the hypothetical worker with the limitations previously described was limited to sedentary exertion level work, as opposed to light exertion level work. The VE confirmed the hypothetical worker would still be able to perform Miller's past relevant work as an office manager, "both as performed and as customarily performed." (Tr. 48-49.) Third and finally, the ALJ asked the VE whether the hypothetical worker could be gainfully employed if she suffered from "chronic, moderately severe fatigue, which . . . would result in [her] being unable to engage in sustained work activity for a full eight-hour workday on a regular and consistent basis." (Tr. 49.) The VE confirmed that such a worker could not be gainfully employed.

In a written decision issued on October 27, 2014, the ALJ applied the five-step process set forth in 20 C.F.R. § 404.1520(a)(4), and found that Miller was not disabled. *See infra*. The Social Security Administration Appeals Council denied Miller's petition for review, making the ALJ's decision the Commissioner's final decision. Miller timely appealed to federal district court.

## THE FIVE-STEP SEQUENTIAL ANALYSIS

### I. LEGAL STANDARD

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal [one of the listed impairments]? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of the first four steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers

in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## II.    THE ALJ'S DECISION

The ALJ first determined that Miller had not engaged in substantial gainful activity since May 1, 2010, the amended alleged disability onset date. At the second step, the ALJ concluded that Miller had the severe impairments of degenerative disc disease of the lumbar spine, Hashimoto's thyroiditis, chronic fatigue syndrome, obesity, and arrhythmias. At the third step, the ALJ found that Miller did not have an impairment or combination of impairments that met or equaled one of the Listed Impairments. The ALJ then assessed Miller's residual functional capacity ("RFC") and found that she could perform light exertion work that involved (1) lifting twenty pounds occasionally and ten pounds frequently, (2) standing, sitting, and walking for up to six hours in eight-hour workday, (3) frequently climbing ramps or stairs, stooping, kneeling, and crawling, and (4) occasionally crouching and climbing ladders, ropes, or scaffolds. The ALJ also found that Miller needed to avoid moderate exposure to non-weather related extreme heat and concentrated exposure to non-weather related extreme cold, fumes, odors, dust, gases, and unprotected heights. At the fourth step, the ALJ concluded Miller is capable of performing her past relevant work as an office manager. Accordingly, the ALJ determined that Miller was not disabled. (Tr. 11-21.)

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d

880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## DISCUSSION

In this appeal, Miller argues that the ALJ erred by: (1) failing to provide clear and convincing reasons for discounting Miller's symptom testimony; (2) rejecting Miller's husband's testimony without giving germane reasons for doing so; (3) failing to provide legally sufficient reasons for rejecting the opinions of Miller's treating physician, Dr. Calvert; and (4) concluding that Miller could perform her past relevant work as an office manager. As explained below, the Court concludes that the Commissioner's decision is free of legal error and supported by substantial evidence in the record. Accordingly, the Court affirms the Commissioner's denial of benefits.

///

///

///

## I.     CREDIBILITY DETERMINATION

### A.     Applicable Law

Absent an express finding of malingering, an ALJ must provide clear and convincing reasons for rejecting a claimant's testimony:

> Without affirmative evidence showing that the claimant is malingering, the [ALJ]'s reasons for rejecting the claimant's testimony must be clear and convincing. If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's [subjective] complaints.

*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 (9th Cir. 1999) (citations omitted). Clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 6:11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) ("[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989))).

### B.     Application of Law to Fact

There is no affirmative evidence that Miller is malingering and, therefore, the ALJ was required to provide clear and convincing reasons for discrediting Miller's symptom testimony.

Upon review, the Court concludes that the ALJ satisfied the clear and convincing reasons standard.

First, the ALJ discounted Miller's symptom testimony because it is inconsistent with her daily activities. (Tr. 19.) "Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination." *Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014). It was reasonable for the ALJ to find that Miller's reported activities, which included providing "personal care" for her husband who is disabled as a result of a "significant brain injury" and "many other injuries" suffered over seven years ago,[3] occasionally exercising or engaging in a "walking routine," caring for a pet, shopping on a weekly basis, paying bills and managing finances, keeping track of her husband's medication and appointments, cooking on a daily basis, doing laundry and dishes, and tending to a small garden, undermined Miller's claim of disability.[4] (Tr. 45, 166, 186, 188, 189, 190, 208, 210, 211, 217, 354.) Indeed, the foregoing activities are incompatible with the degree of impairment alleged by Miller, who claims, for example, that she can only lift "under two pounds," has difficulty with

---

[3] Miller argues that the ALJ had "no way of knowing" whether her husband's disability is "physical or mental or what activities may be involved in caring for him," and that she may do "nothing more strenuous . . . than sorting . . . medications for him." (Pl.'s Reply at 5.) Miller's testimony, however, touches on the nature of her husband's disability and indicates that she handles the couple's personal care. (*See* Tr. 45, "I take care of our dishes. Our personal care," Tr. 169, "My husband who is disabled depends on me for his care and well-being. . . . We do our basic care," Tr. 217, "[M]y husband . . . is disabled, having suffered a significant brain injury among many other injuries [seven] years ago. I do all the bill paying and paperwork that is needed in our household"). Thus, it was not unreasonable for the ALJ to draw the inferences that he did.

[4] The ALJ's written decision did not rely explicitly on some of the activities cited herein, but it is appropriate for the Court to consider additional support for a ground on which the ALJ relied. *See Fenton v. Colvin*, No. 6:14-00350-SI, 2015 WL 3464072, at *1 (D. Or. June 1, 2015) ("The Court is not permitted to affirm the Commissioner on a ground upon which the Commissioner did not rely, but the Court is permitted to consider additional support for a ground on which the ALJ relied.").

concentration, short-term memory, and recall, and "sometimes struggles" to complete "simple paperwork." (Tr. 45, 185.)

Second, the ALJ discounted Miller's testimony based on evidence of conservative treatment. (Tr. 19.) For example, the ALJ noted that Miller was prescribed medications at times, "but little other treatment was recommended beyond diet and exercise." (Tr. 19.) The Ninth Circuit has "previously indicated that evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Bartlett v. Colvin*, No. 1:14-cv-00142-SB, 2015 WL 2412457, at *12 (D. Or. May 21, 2015) (quoting *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007)). The record indicates that Dr. Calvert advised Miller to treat her conditions by reducing her caloric intake and engaging in regular exercise. (*See, e.g.*, Tr. 347.) Accordingly, the ALJ's finding is supported by substantial evidence because diet and exercise are conservative treatment. *See Martin v. Colvin*, No. 3:14-01603-SB, 2016 WL 890106, at *11 (D. Or. Feb. 9, 2016) (explaining that diet and exercise are conservative treatment); *see also Bartlett*, 2015 WL 2412457, at *12 (noting that the use of Vicodin is conservative treatment).[5]

Third, the ALJ discounted Miller's testimony based, in part, on conflicting medical evidence. *See Bowers*, 2012 WL 2401642, at *9 (noting that conflicting medical evidence is a clear and convincing reason for discounting a claimant's testimony). For example, the ALJ noted that Miller's "physical examinations have been nearly normal with just a few abnormal findings at times," and that Miller's "imaging has shown no more than mild abnormalities." (Tr. 19.) The ALJ assigned great weight to the opinions of the state agency physicians, who determined that Miller was not disabled, because they were "consistent with the totality of the evidence in the

---

[5] The record suggests that Dr. Calvert also prescribed Vicodin to Miller. (*See, e.g.*, Tr. 440.)

record, including the mild findings of [Miller's] imaging, her generally normal physical examinations, and her activity level." (Tr. 20.) These findings are supported by substantial evidence. (*See* Tr. 340-41, noting that x-rays of Miller's right hip were normal, and x-rays of her right knee revealed only "mild osteoarthritis of the medial compartment," Tr. 413, instructing Miller to exercise regularly and noting that her spine range of motion and paraspinal muscle strength were normal, she exhibited no joint or limb tenderness to palpation in the right and left lower extremities, and she exhibited no tenderness to palpation in right and left upper extremities, Tr. 452, noting that Miller exhibited a "normal gait" and "grossly normal tone and muscle strength" on physical examination, Def.'s Br. at 6, citing a number of benign objective medical findings; *but cf.* Tr. 421, noting that Miller complained of chronic pain in her joints and right hip).

Fourth, the ALJ discounted Miller's testimony on the ground that she was not always compliant with her treatment plan. (*See* Tr. 19, noting that Miller's "compliance with diet and exercise is unclear, but does not appear to be fully compliant"). Medical noncompliance is a clear and convincing reason for discounting a claimant's subjective symptom testimony. *Bowers*, 2012 WL 2401642, at *9. It was reasonable for the ALJ to conclude that Miller was not always compliant with the treatment plan recommended by Dr. Calvert. (*See, e.g.*, Tr. 344, observing that Miller had "been having difficulty complying with the recommended levels of diet and exercise").

Based on the foregoing, the Court declines to second-guess the ALJ's credibility determination because it is reasonable and supported by substantial evidence. *See Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) ("[T]he ALJ's interpretation of [the claimant's] testimony may not be the only reasonable one. But it is still a reasonable interpretation and is

supported by substantial evidence; thus, it is not our role to second-guess it."); *Dowell v. Berryhill*, No. 16-614-SI, 2017 WL 1217158, at *5 (D. Or. Apr. 3, 2017) (noting that an ALJ's credibility determination may be upheld even if some of the reasons provided were not legally sufficient).

## II.    LAY WITNESS TESTIMONY

### A.    Applicable Law

An ALJ must consider lay witness testimony concerning a claimant's ability to work. *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009). The ALJ cannot disregard such testimony without providing specific reasons that are germane to each witness. *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006). "Inconsistency with medical evidence is one such reason." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). "Germane reasons for rejecting a lay witness' testimony [also] include inconsistencies between that testimony and the claimant's presentation to treating physicians or the claimant's activities, and the claimant's failure to participate in prescribed treatment." *Barber v. Astrue*, No. 10–1432, 2012 WL 458076, at *21 (E.D. Cal. Feb. 10, 2012). Furthermore, "when an ALJ provides clear and convincing reasons for rejecting the credibility of a claimant's own subjective complaints, and the lay-witness testimony is similar to the claimant's complaints, it follows that the ALJ gives 'germane reasons for rejecting' the lay testimony." *Williams v. Astrue*, 493 F. App'x 866, 869 (9th Cir. 2012) (citation omitted).

### B.    Application of Law to Fact

In his written decision, the ALJ assigned only "some weight" to Mr. Miller's third-party adult function report because it was inconsistent with Miller's "generally normal physical examinations and overall mild findings" and, therefore, failed to establish that Miller is disabled. (Tr. 20.) Miller disputes whether the ALJ's findings amounted to specific reasons that were

germane to her husband. (Pl.'s Br. at 16-18.) The record reveals that Mr. Miller's testimony

parallels his wife's complaints. (*Compare* Tr. 185-93, *with* Tr. 208-15.) As discussed, the ALJ

provided clear and convincing reasons for discounting Miller's subjective complaints.

Accordingly, it follows that the ALJ provided germane reasons for rejecting Mr. Miller's related

testimony. *See* Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009) ("In

light of our conclusion that the ALJ provided clear and convincing reasons for rejecting

Valentine's own subjective complaints, and because [Mr. Valentine's wife's] testimony was

similar to such complaints, it follows that the ALJ also gave germane reasons for rejecting her

testimony.").

### III.     MEDICAL OPINION EVIDENCE

#### A.     Applicable Law

"There are three types of medical opinions in social security cases: those from treating

physicians, examining physicians, and non-examining physicians." *Valentine*, 574 F.3d at 692

(citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining

physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and

resolve the conflict.'" *Id.* (citation omitted). "An ALJ may only reject a treating physician's

contradicted opinions by providing specific and legitimate reasons that are supported by

substantial evidence." *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (citation and

quotation marks omitted).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and

thorough summary of the facts and conflicting clinical evidence, stating his interpretation

thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting

*Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions is insufficient:

"The ALJ must do more than state conclusions. He must set forth his own interpretations and

explain why they, rather than the doctors', are correct." *Id.* "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citation omitted).

### B.    Application of Law to Fact

Miller argues that the ALJ failed to offer legally sufficient reasons for discounting Dr. Calvert's opinion, in particular his opinion that Miller is unable to perform sedentary work. The Court disagrees.

Dr. Calvert's medical source statement dated December 11, 2013, conflicts with the assessments completed by the non-examining state agency doctors, none of whom opined that Miller lacks the physical or mental capacity to perform substantial gainful activity. Therefore, the ALJ needed to provide specific and legitimate reasons for discounting Dr. Calvert's opinion evidence. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("[I]n the case of a conflict 'the ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician.'"); *Kilian v. Barnhart*, 226 F. App'x 666, 668 (9th Cir. 2007) ("Kilian's contention that the ALJ erred when he discounted her treating physician's opinion is flawed because the treating physician's opinion conflicted with that of a nonexamining physician, and the ALJ supported his decision with specific and legitimate reasons."). The ALJ did so here.

First, the ALJ discounted Dr. Calvert's opinion evidence because it is inconsistent with his own treatment records. *See Hutchens v. Astrue*, 433 F. App'x 510, 511 (9th Cir. 2011) (noting that an inconsistency between a physician's assessment of a claimant's restrictions and his own records constituted a specific and legitimate reason for discounting his opinion); *see also*

*Salchenberg v. Colvin*, 534 F. App'x 586, 588 (9th Cir. 2013) (noting that internal inconsistencies in an examining psychologist's report constituted a specific and legitimate reason to discount the opinion). Substantial evidence supports the ALJ's finding. Of note, Dr. Calvert opined that Miller suffers from "significant" arthritis in her right hip and that Miller was not responding to treatment, yet his records reveal that a recent x-ray of Miller's hip was normal and Miller was not always compliant with her conservative treatment plan. (*Compare* Tr. 445, *with* Tr. 437-38.) Dr. Calvert also opined that Miller suffers from debilitating back problems, yet he noted benign objective findings on several physical examinations. (*Compare* Tr. 445, *with* Tr. 413.) Thus, it was not unreasonable for the ALJ to find that Dr. Calvert's opinions conflicted with his own records. *See Myers v. Barnhart*, No. 04–cv–994, 2006 WL 1663848, at *6 n.7 (C.D. Cal. June 6, 2006) ("Where a treating physician's conclusions about a claimant's functional limitations 'are not supported by h[er] own treatment notes,' the ALJ may reject that opinion."); *Richie v. Colvin*, 564 F. App'x 336, 338 (9th Cir. 2014) (upholding rejection of treating physician's opinion based, in part, on his notes failing to substantiate his view regarding the claimant's limitations).

The ALJ also discounted Dr. Calvert's opinion on the ground that it was based to a large extent on Miller's self-reports, which, as discussed above, the ALJ properly discounted as not entirely credible. It is well settled that "[a]n ALJ may reject a treating physician's opinion if it is based to a large extent on a claimant's self-reports that have been properly discounted as incredible." *Burrell v. Colvin*, 775 F.3d 1133, 1140-41 (9th Cir. 2014) (citation and quotation marks omitted). Miller disputes whether Dr. Calvert's opinion was based to a large extent on her self-reports. In support of her argument, Miller notes only that Dr. Calvert directed the reader of his medical source statement to fifty pages of "treatment notes for more information regarding

the basis of his opinion." (Pl.'s Br. at 11.) The Court is not persuaded by Miller's argument. The Court concludes that it was reasonable for the ALJ to find that Dr. Calvert's opinion was based to a large extent on Miller's self-reports, in light of the disconnect between Dr. Calvert's opinion and his own clinical findings, as outlined above. In other words, it was reasonable for the ALJ to conclude that the opinions Dr. Calvert included in his medical source statement were necessarily based on Miller's self-reports, because the opinions were clearly not based on his own clinical findings.

Third, the ALJ rejected Dr. Calvert's opinion in favor of, among other things, the conflicting opinions offered by the non-examining state agency physicians, Drs. Alley and Wiggins. (*See* Tr. 20, assigning "great weight" to the state agency physicians' opinions because they are consistent with the totality of the evidence, and discounting Dr. Calvert's opinion evidence because it is "out of proportion and inconsistent with the rest of the medical evidence"). The state agency physicians' conflicting opinions regarding Miller's functional capacity, coupled with the other reasons described above, constitute the substantial evidence necessary to affirm the ALJ's rejection of Dr. Calvert's opinion evidence. *See Morford v. Colvin*, No. 15-01216-SB, 2016 WL 3092109, at *8 (D. Or. June 1, 2016) (stating that a state agency doctor's opinion, coupled with other reasons provided by the ALJ, constituted "the substantial evidence necessary to affirm the ALJ's rejection" of another doctor's opinion evidence).

For these reasons, the Court concludes that the ALJ's rejection of Dr. Calvert's opinion was supported by substantial evidence in the record and, therefore, should not be disturbed on appeal.[6]

---

[6] Miller also argues that the ALJ failed to identify "any actual inconsistencies" between Dr. Calvert's treatment records and his diagnosis of chronic fatigue syndrome. (Pl.'s Br. at 10.) The relevant inquiry is not whether Miller was correctly diagnosed as having chronic fatigue

## IV.  RFC AND VE HYPOTHETICAL

### A.  Applicable Law

"The hypothetical an ALJ poses to a [VE], which derives from the RFC, 'must set out all the limitations and restrictions of the particular claimant.'" *Valentine*, 574 F.3d at 690 (citation omitted). "Thus, an RFC that fails to take into account a claimant's [credible] limitations is defective." *Id.*; *see also Burke v. Comm'r of Soc. Sec.*, No. 13–1890, 2015 WL 769951, at *5 (D. Or. Feb. 23, 2015) ("An ALJ's RFC need only incorporate credible limitations supported by substantial evidence in the record and [it] must be consistent with the restrictions identified in the medical testimony.").

### B.  Application of Law to Fact

Miller argues that the hypothetical posed to the VE, which was derived from the ALJ's RFC determination, failed to set out all of her credible limitations and restrictions because the ALJ improperly rejected Miller's testimony, Mr. Miller's lay witness testimony, and Dr. Calvert's opinion evidence. (Pl.'s Br. at 18.) Miller argues that consequently the ALJ's decision is of no evidentiary value because it is premised on a hypothetical that is incomplete and lacks factual support. The Court rejects Miller's argument for all of the reasons previously discussed in this Opinion.

///

///

---

syndrome based on Dr. Calvert's findings and observations. Rather, the issue is whether the ALJ provided legally sufficient reasons for discounting Dr. Calvert's opinions regarding the functional limitations that have resulted from Miller's chronic fatigue syndrome, which the ALJ found to be a severe medically determinable impairment at step two of the sequential evaluation process. As discussed, the ALJ provide sufficient reasons for discounting limitations and restrictions identified by Dr. Calvert that were in conflict with other substantial evidence in the record.

**CONCLUSION**

For the reasons stated, the Court affirms the Commissioner's decision because it is free

of legal error and supported by substantial evidence.

IT IS SO ORDERED.

DATED this  22nd  day of May, 2017.

_____
STACIE F. BECKERMAN
United States Magistrate Judge